Mr. Waxman. Mr. Chief Justice, and may it please the Court, the participants in the ratification debates disagreed about whether the new Constitution would or should subject states to suit in the new courts of the soon-to-be-superior sovereign. But they were unanimous in their understanding of the importance of ratification, and they agreed to ratify it. In their understanding that states could not be sued in the courts of other states, Edmund Pendleton, chairing the Virginia Convention, proclaimed, quote, the impossibility of calling a sovereign before the jurisdiction of another sovereign, echoing writings and speeches given by Hamilton, Marshall, and Madison, among others. In Chisholm itself, Edmund Randolph ---- Sotomayor, it's nice that they felt that way, but what we know is they didn't put it in the Constitution. And so we talk a lot now about not relying on legislative history, but relying on the plain text of the Constitution. Could you tell me what there is in our original case, the Nevada ---- in our original case that didn't address this argument and say it wasn't compelling? What is new from ---- Roberts' Are you saying the original case, do you mean Nevada v. Hall? Sotomayor What is new in any of the arguments that were raised in Nevada v. Hall that weren't addressed by the Court? Well, as we point out, first of all, what was new ---- Sotomayor I know you say it was wrong. Putting aside the wrongness. Roberts I want to ---- I want to ---- I'm not going to harp on the wrongness. I think that's relatively clear from our petition and our merits ---- Sotomayor Well, I know that's your position, but let's ---- Roberts I think before I address what the Court missed in Nevada v. Hall, I just want to point out that when you say what changed, the only thing ---- Nevada v. Hall represents the only case in State or Federal court in the 200 years prior that had ever recognized the ability of one State to compel another State to answer. It cited zero cases. And while it isn't new, from the time this Court, at least the time this Court decided Hans v. Louisiana until whatever its most recent case was on sovereign immunity, it has always stated repeatedly, uniformly, that as the Court explained in Alden, State sovereign immunity is demarcated by fundamental postulates implicit in the constitutional design. It, quote, sovereign immunity derives from the structure of the original Constitution. Now, I can ---- Sotomayor So what do you think is the structure? Since most sovereign immunity, there's a lot of customary law involving it, but at the essence, and it was this way in the United States for a very long time, recognizing the sovereign immunity of a foreign State was at the discretion of the host State. Now, the U.S. followed the pattern, but in the Tate letter, it changed it around. What do you think in the constitutional design reflects the willingness of one State to give up its power to protect its own citizens from the actions of another State who might intrude directly? Now, we know, because we recently had a case, that States can be sued. Were you on that case? I can't remember now. I don't know what you're talking about. We had a case recently where there's a question about whether a State can be sued to quiet title in another State. So if one State owns property in another State, it can be hauled into court to quiet title of that property. So we know that the rule wasn't absolute, possibly, and so the question I have is where in the constitutional design do we see, and in light of the constitutional reservation to States of all powers not designated by the Constitution, their ability to protect their own citizens in their own States? Okay. So I'm going to give you what I believe are the textual basis in the Constitution itself for the implicit plan, the underlying postulate that this Court has recognized for well over 130 years. But let me just address first your point about international comedy under the law of nations. It is true that nations with no superior sovereign and no mechanism to enforce their rights under the law of nations had the raw power to violate the law of nations obligation that friendly States respect each other's sovereign immunity, just as they respect each other's sovereign immunity to declare war or to refuse to recognize each other's judgments. But the States of the Union, in ratifying the Constitution to form a more perfect union, surrendered their powers to treat each other as legal strangers. They gave up the wild west of international law. Mr. Waxman, just so I understand you, are you saying that the States pre the Constitution were in the same position as foreign nations? In other words, it was, their immunity then was a matter of comedy rather than a matter of legal requirement. Is that correct? So my view is, and I think this is well recognized in the Court's cases, that prior to, certainly prior to the Articles of Confederation, but in any event, prior to the Constitution, the States stood in respect to each other and had obligations under the law of nations. And the law of nations, it's true that in essence the law of nation obligation to not haul an unconsenting sovereign into your courts was unenforceable, and it's true that this Court has referred to it as therefore in effect a matter of comedy. And States were in that situation. But this Court explained in First National City Bank versus the Bank of China and in the Sabatino versus Cuba case that, and it's reflected in the Schooner Exchange itself, that what comedy meant was that there was no obligation to adhere to apply that or any other law of nations except with respect to friendly nations that the sovereign recognized. And those, that certainly characterized the States of the Union. And that's why, you know, this Court in Alden and many other cases said that, quote, the contours of sovereign immunity are determined by the founders' understanding, and their understanding expressed by the anti-federalists, the federalists who thought it would be terrific if States could be sued in federal court, and the federalists who, like Madison and Marshall, who assured everyone that it wouldn't, they all understood that because the States were recognized by each other and were friendly, there was an absolute law of nations immunity. It's odd, then, that Marshall didn't say that in Schooner-McFadden, nor did Joseph Sestori in Santissima, Trinidad, or whatever it is, nor did Vattel. What they said was, it's a question of consent, that of course the State, I mean, I can read it to you, all exceptions to the full and complete power of a nation within its own territory must be traced up to the consent of the nation itself. And that's what they said. And I didn't find language like raw power, but what I found was, it's a matter of comedy, it's a matter of consent, and of course most nations follow it. But if somebody didn't, you couldn't say it violated international law. And then the question that I'd like to hear the answer to is what Justice Sotomayor asked. And of course, the founders were all talking about a situation where they were worried about federal power and the federal suit and bringing who could sue people under the federal power. So when I looked at this before, which I did, I found international authority after international authority, many, that said just what Marshall said, that said just what Sestori said, and you say, well, are states different? Well, they're not different in two respects. Almost all of them do. Give immunity to the other state. But if you find an outlier that doesn't, you can't say it violates international law, were they states? There we have Justice Sotomayor's question. And what in the Constitution would have to be something that in this respect makes them less sovereign? What is it that says you can't have an outlier? So when you say, you know, if some states refuse to recognize that principle, well, that was one thing. No state before ratification until Nevada v. Hall had ever done such a thing. This Court before Nevada v. Hall in a half a dozen cases stretching over 100 years. I know they didn't. That isn't quite my question. Of course they didn't. Almost all countries recognized sovereign immunity. But you might have one, I mean, I don't know, maybe Tasmania if it was a state that didn't recognize it. And the question is, do you have to? And the answer of Marshall? Story? Vattel? No. You don't have to. So I think Vattel, who was quoted and referenced in, I'm going to talk about Vattel, the schooner exchange, and then the point of what changed when the Constitution was adopted. And then where in the text of the Constitution I'm citing my authority, which I forgot to address. Vattel and other commentators at the time, whose jurisprudence was also referenced in the ratification debate, held, stated that sovereign immunity was a mandatory limit on the power of one sovereign to adjudicate another's claim, to adjudicate claims against another sovereign. And he held that the response to a violation of that law of nations was war. Now, in the schooner exchange, Chief Justice Marshall says, of course, a sovereign has absolute discretion over its own territory. There is a law of nations principle that friendly nations, in that case whose ships appear in our ports, whose sovereign ships that appear in our ports, under the law of, there are certain principles under the law of nations in which the host state is deemed as a matter of the law of nations to have waived its sovereign authority, to have its courts exercise jurisdiction. And he explained why that was the case. That is, there was an implicit consent. Now, in the plan of convention, the states, you know, at international law, if there was a violation of it, the nations had all sorts of retaliatory measures. They could blockade each other, embargo each other, make war on each other, all sorts of things. Marshall, who is a pretty good authority, I happen to know this because we had this case before, but if you look at quotes for Vattel 472, okay? And what he says Vattel says, I never read all those pages, but I read some of them. He says Vattel says that the consent of the foreign sovereign may be implied through a tacit convention, but it suggests that it rested upon consent. It says that consent may be implied. Yes, and with respect, Justice Breyer, what the Schooner Exchange says several times in Chief Justice Marshall's opinion is that the states, sovereign states are deemed to have consented to recognize the sovereign immunity of other sovereigns in those instances in which, and that are enumerated, and he explains why a visiting warship of a friendly nation is one of those things. Now, even if I'm wrong about that, the fact of the matter is that in the plan of convention and in the text itself, the states, in order to form a more perfect union, surrendered all of the retaliatory means that nations would have had in order to deter or enforce or punish violations. And Mr. Waxman, that's what I understood your basic argument to be, right? That there was the system of comedy, it all worked very well, essentially, at least in part because states knew that they had all these powers that they could use against each other, and then they gave up those powers at the convention. So what replaced it? What replaced it was a constitutional rule. That's your basic story. Is that correct? Yes, a constitution. And I guess I just find myself thinking that, I mean, sort of, you know, going back to Justice Sotomayor's question, what's the evidence of that? Because this is a gigantic constitutional debate. There are a thousand issues on the table. Everybody has things that they want. And this idea that there's this one-for-one exchange that you have, we give up our power to blockade, we get a rule of sovereign immunity, I mean, that's just not how big negotiations work. And unless you can show me evidence that that was the trade. I mean, if I could just, if you would bear with me for one more moment, Professors Bode and Sachs tell about another trade. Their trade is that there wasn't a rule of sovereign immunity, but the states retained their ability not to enforce judgments against them if they violated their own immunity. So, I guess what I'm saying is, all of these trades, you can hypothesize them, but they are just hypotheses. And what's the evidence for any of them? So, I would say the evidence, I mean, there is a lot of evidence. I don't think there's any disagreement that the framers intended to constitutionalize fundamental aspects of sovereignty. The reference to the former colonies as states. The reference to, in the Privileges and Immunities Clause, of citizens of states. The limitation, the expressed limitations in the Constitution, including Section 10 of Article I. And, of course, the Eleventh Amendment itself makes sense only if the states are sovereign. Well, maybe that's your answer to this question. But I'm still, you know, because we are all always very vigilant not to read things into the Constitution that can't be found in the text, I'm waiting for the answer to Justice Sotomayor's question about what provisions of the Constitution you would point to. So, I would point to the provisions of the Constitution that are enumerated by Justice Scalia in his opinion for the Court in Prince, which were reiterated again by Justice Kennedy for the Court in Alden, some of which I have recognized, I have already recited. The preserving fundamental aspects of sovereignty, yet withdrawing the ability to protect sovereignty vis-à-vis either nations or other states, was intended in exchange for a guarantee that the then law of nations, the then principle of sovereignty under the law of nations would be protected by the Constitution and enforced by this Court. Justice Kagan has referred to it as a one-for-one bargain. But what there really was, was the plan, the genius of the Constitution, the structural provisions of the Constitution, was that the states, having had an agreement, by ratifying, they surrendered their powers to treat each other as legal strangers. In other words, in Chief Justice Marshall's words, they were deemed to waive whatever sovereign prerogative they had to violate the law of nations principle and haul one another into each other's courts. Given how important this is, as you describe, why is it not in the text of the Constitution, in your view? Given that the Constitution is a document, in my view, of majestic specificity, it's got a lot of specific details on very minute things. And this issue, which you say, rightly, is so important, but then somehow was not mentioned in the text of the Constitution. I mean, this Court has been explaining, at least since Hans, that the principle of state sovereign immunity was so fundamental that it is a postulate that underlies and gives meaning to other provisions of the Constitution, including, as then-Justice Rehnquist explained in his dissent in Nevada v. Hall, the Eleventh Amendment itself. But in this regard, Justice Kavanaugh, this principle of state sovereign immunity is no different than Chief Justice Marshall's recognition in McCulloch v. Maryland of the constitutional principle of intergovernmental immunity, of the principle against commandeering that's recognized by the Court in Prince and New York v. United States. In the principle, the equal footing doctrine and the dormant commerce clause, the Constitution was not, as commentators and I believe some of the founders explained, was not meant to replicate a European code of laws and regulations. There were some things that were understood and were fundamental to the Union that are not expressed in text like those doctrines. When the states disagreed with us in Chisholm about the ability to haul states into federal court, the states amended the Constitution. We got the Eleventh Amendment. We have 44 states suggesting we overrule Hall. That's two-thirds of the states. Why don't they move to get the Constitution amended? If we're getting it wrong, you're asking us to do their work. If this is such an important principle to them, they could express it very directly the way they did in the Eleventh Amendment. Well, that statement, that observation, Justice Sotomayor, and by the way, including California, there are 47 states, so we have three states that haven't spoken. They've got a lot of representatives in the House and in the Senate. If they're really excised, they can do something about it? But instead, they're choosing to let us decide that an individual state doesn't have the right to protect its citizens. You could have said exactly the same thing about why pardon shouldn't be overruled. You could say exactly the same thing about any number of outlier, anomalous constitutional decisions of this Court that were then overruled. There is always, of course, the option of amending the Constitution. But this is a very serious step. We are entrenching very directly on the state's right to protect its citizens. And there are amici who suggest that there are principles that concabine that. We've already recognized them. This turned from a multimillion-dollar case into, what, a $100,000 case now? And counting. Well, that's because of the attorneys. But... It's always the attorneys. Always the attorneys. Well, and the millions of dollars in costs that the sovereign state of California has expended defending itself. And this is not some one-off problem. This is, in fact, a significant problem. We cited a half a dozen of recent cases. The states themselves have added another ten. And just this weekend, the newspapers reported, I mean, this is astonishing, in talking about disrespecting the dignity and sovereignty of states. A Nevada citizen sued the Commonwealth of Massachusetts in Nevada state court, Steve Wynn, the casino operator. And he sought, and on Friday evening, obtained an injunction from a Nevada state judge in joining the Massachusetts Department of Gaming Regulation, from issuing a report it had prepared evaluating the suitability of Mr. Wynn to operate a casino in the Boston area. That's the nature of the problem. Now, yes, the states could propose an amendment to a Constitution. Our Constitution is not amended lightly. And the fact of the matter is, and we've cited a number of state court, decisions that followed Nevada v. Hall, they all express shock. The same kind of shock and surprise that met Chisholm. It's true, Chisholm produced a very under-inclusive Constitutional amendment. But they were, all these state Supreme Courts are basically saying, okay, well, you know, we all thought for 200 years before Nevada v. Hall, that we couldn't exercise sovereignty, we couldn't exercise judicial power over another state's sovereign. And in fact, in 19, I think it was 1961, in the Western Union case, this Court dismissed a suit in the Pennsylvania state courts on the grounds that New York was a necessary power, was a necessary power. Mr. Waxman, if I could take you back to some of the questions you were previously asking, because I want to give you a chance to sort of give your best argument, which is, you know, given that you're claiming that the system of comedy, which was working well for all the states, that this system was converted into a particular Constitutional rule at the framing, and a very particular one, because there could have been other ways, as Professors Bodie and Sack suggest, for the states to protect themselves. Given that that's what you're claiming, what is the best, and I'll expand what some of my colleagues have said, you don't have to give me even textual evidence, what's the best textual or historical evidence that the states made exactly this bargain at the framing? Let me take a try with something I haven't called out yet. Inherent in our Federal Union is the principle that no state may regulate the government of another state. And just as one state's governor can't direct the bureaucracy of another, and one state's legislature can't regulate the government actions of another, one state's judiciary can't call another state's government to the bar of the court, and sanction it for carrying out its own laws. That is unconstitutional interference with the independence of the states, just as reflected in these other non-textual Constitutional principles that I previously identified. Now, you've referred a couple times to this amicus brief by Professors Bawdy and Sacks. Professors Bawdy and Sacks acknowledge that there was a universal rule in the law of nations. Their argument is it wasn't constitutionalized. It just stayed some sort of common law rule. It wasn't abrogated, but it wasn't constitutionalized. The world, the regime they envision, in which states can ignore what they acknowledge to be a universal rule, but don't worry about it, because by invoking common law precedents superseded 150 years ago by Pennoyer versus Neff, states can just refuse to honor any resulting judgment. That is not the Constitutional Union that the framers envisioned or produced. That's my best shot. If I could reserve the balance of my time. Thank you, Counsel. Mr. Chemerinsky. Good morning, Mr. Chief Justice, and may it please the Court. Forty years ago, in Nevada versus Hall, this Court held that states may exercise their sovereign power under the Tenth Amendment to define the jurisdiction of their courts and protect their citizens when injured, including by their states. There is no compelling reason for overruling this precedent, discarding stare decisis. At the very least, in this case, under the law of the case doctrine, this is the established law. In Nevada versus Hall, this Court concluded by saying that to prevent states from exercising their jurisdiction in this manner would be the real intrusion on the power of the states under the people of the United States. Under the Tenth Amendment, the question for this Court is, is there anything in the Constitution that keeps states from exercising this jurisdiction? I'd suggest this Court can look to three sources. The text of the Constitution itself, the Constitutional Convention, and the pre-ratification history. Mr. Chemerinsky, Mr. Waxman did point to something that's important. Intuitively and otherwise, we would say it would be wrong for one state to tell another state how to run its government, or how to run an agency, or what rules it should follow within its own state. Then what is it that keeps them from doing that if it's not the Constitutional structure? First, comedy protects states. This is the comedy that existed at the pre-ratification period and continues. This case shows the importance of that comedy. Initially, the Nevada Supreme Court excluded all negligence claims based on comedy. Then the Nevada Supreme Court struck a $250 million punitive damage award based on comedy. It shows that comedy was protection both in the pre-ratification period and now. I just don't see comedy being enough. I know one of your amici suggested that questions of personal jurisdiction should take care of most cases. And actually, I did look at this case and I was trying to figure out what it was that Nevada did to intrude or what California did to intrude physically on Nevada. And I know that the supposed agent who was doing this investigation, not supposed, she is an agent, crossed state lines, I think it was alleged, and rummaged through garbage and rummaged through personal mail. Is that correct? They invaded his property rights. They defamed him. They also revealed private information about him to a large audience. Was that in Nevada or in California? That was in Nevada at his home. They did these things. And I think that's crucial, Justice Sotomayor, because while there's the importance of one state not regulating another, there's also the crucial interest that a state has in protecting its citizens when they're injured, including by another state. This Court has long recognized that as a vital interest of the states. But to go back to your initial question, in addition to comedy, in addition to personal jurisdiction, this Court created a very important protection for states when this case was last there. This Court said that a state, when sued in another state, is liable for no more than the form state would be liable for. So the damage judgment on the basis of that rule, which this Court found on full faith and credit, was limited to $100,000. I go back to your initial question to Mr. Waxman, the text of the Constitution. When the text of the Constitution wanted to limit state power, it did so explicitly. The full faith and credit clause, the fugitive slave clause, the privilege and immunities clause. There is no textual provision in the Constitution that limits the power of a state under the Tenth Amendment to define its own jurisdiction, write a remedy for others when they're injured. If you look at the Constitutional Convention, this wasn't discussed at the Constitutional Convention. In fact, in Nevada v. Hall, this Court explicitly said, and I quote, it was not a matter of concern. And then you can go to the pre-ratification period, and Justice Kagan, you summarized it accurately. In the pre-ratification period, the protection that a state had from another state was based on comity. In fact, if you look at pages 31 and 32 of the Petitioner's Brief, it explicitly says in the pre-ratification period there was no protection based on sovereign immunity. It was comity, the same comity that exists today to protect a state from another state. What do you do with Federalist 81, which said that it was inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent, and said that would remain with the states? That was Hamilton speaking in Federalist 81, reflecting a notion that it's inherent in the nature of sovereignty. Is that incorrect? No, Your Honor, it's not incorrect, but you must put it in the context in which it was written. The concern at that time was whether the new government and these new Federal courts would be able to hold state governments liable. They were very afraid because of their debts they might be bankrupt. And so Hamilton was providing assurance to the states that they wouldn't be held liable in Federal court. That's what the 11th Amendment was about overruling Chisholm v. Georgia. It was about limiting the power of the Federal courts relative to state governments. Alden v. Maine was about the power of Congress to require a state to suit against itself. In Nevada v. Hall, this Court said sovereign immunity existed to protect a government from being sued in its own courts. It was only comedy that protected other states from being sued. But do you think it's plausible that there would be a great concern about a state's being sued in a Federal court, which is a more neutral tribunal, but no concern about a state being sued in the courts of another state? Yes, for two reasons, Your Honor. First, the framers were very concerned, especially the anti-Federalists were concerned, about the powers of this new level of government, the Federal courts. They had already seen that they had protection state to state based on comedy. And second, Your Honor, quite important, the states didn't want to give up their own power. Had the states put in the Constitution a limit on the ability to sue against other states with a limit on state power, the states didn't perceive it necessary because of comedy, and they didn't want to restrict their own authority. But the comedy that exists... What is your answer to the argument that once the United States was formed, either under the Articles or under the Constitution, the relationship between the states was entirely different from the relationship among foreign states? Yes, Your Honor, it was different. And where the Constitution wanted to make it different, it said so explicitly. In provisions like the Full Faith and Credit Clause, the Fugitive Slave Clause, and the Privileged Immunities Clause, there is no indication of such a limit in the text of the Constitution, in the Constitutional Convention, or from the pre-ratification era. You know, if California were a republic, if we had the California Republic, which is something some people in California would like, it would have a lot of leverage over Nevada that it doesn't have now, wouldn't it? Yes and no, Your Honor. It overwhelms it in every respect. So Nevada would have to be careful about what it did to California. But the situation now is different because there are states in the Union. I think Nevada might already feel that California overwhelms it too much. But in terms of international, I go back to Justice Breyer's point with regard to his questions to Mr. Waxman. The Schooner Exchange case said that under the national law, the only protection a foreign country had another sovereign was based on comity. And there's no indication that that was insufficient. The reality is that this is an issue that relatively rarely arises. Well, and the remedy for the failure to accord comity in international law was recognized to be war. What remedy do the states have, under your view, if a state chooses not to extend comity to a sister state? Well, they certainly have remedy in this Court, based on Hyatt II, that damages will be limited to the amount that the forum state would be liable. And second, they have a prospective remedy that's quite important. States can enter into a compact with one another to prevent themselves from being sued. Justice Sotomayor talked about... But that requires an agreement of the other states. Well, for example, to go back to Justice Alito's question, California and Nevada could enter into a compact any time they want, that they will not allow suits in their courts against the other state. There's nothing that keeps the states from doing that. Well, but you have to assume that the two states are willing to do that. Nevada may think that given the disparity in a number of respects between them and California, that its best hope is to be able to sue California in its states. So it has an entirely different view of the significance of that right than California would. The idea that, well, you can just go agree on something is not going to be a complete answer. Well, Your Honor, that's true, but then you go back to the Tenth Amendment. Does Nevada have the sovereign power as a state to choose to not enter a compact, to define the jurisdiction of its courts, and be able to write a remedy when its citizens are injured by another state? That is part of its sovereign power, which is exactly what Nevada v. Hall said. Mr. Waxman says that there were no cases prior to Nevada v. Hall. Actually, if you look at footnote 29 in Nevada v. Hall, it does cite to a case, State of Georgia v. City of Chattanooga. It says that if a state owns property in another state, it's subject to eminent domain and judicial proceedings in that state, like any other owner of property. I think the key is there weren't many cases either before Nevada v. Hall, and there aren't many cases since Nevada v. Hall. That's because this isn't something that arises very frequently. But when it does arise, it is so important that a state be able to exercise its sovereign power. But, Your Honor, I would stress to you that this doesn't come to the Court on a blank slate. There's a 40-year-old precedent, and this Court has made clear that it will overrule stare decisis only if there's a compelling reason. Everything that Mr. Waxman said to you today about the plan of the Convention was argued to this Court in 1979 in Nevada v. Hall. Nothing has changed since then. Mr. Waxman, in his brief, points to this Court's sovereign immunity decisions, but they're quite distinguishable. Most of them have been about the 11th Amendment and the power of the federal courts. And, of course, that's quite different than whether or not the Constitution prohibits a state from hearing suits brought by citizens of another state. Alden v. Maine is quite distinguishable because it involved whether Congress could force a state to do suits against itself. In Alden v. Maine, this Court explicitly drew a distinction between sovereign immunity of a state in its own courts as opposed to the ability to sue another... citizens of another state to sue in state court. Alden v. Maine very clearly said that it was consistent with Nevada v. Hall. And so in that sense, there is nothing that has changed since it was argued to this Court in 1979, and there's no compelling reason for overturning stare decisis. Finally, I would argue to you that at the very least, the law of the case doctrine is controlling in this case. Just on the stare decisis question, wouldn't it be relevant, though, that the case law that's developed subsequent to Nevada v. Hall seems quite inconsistent with the principles in the majority opinion and more consistent with the principles in Justice Rehnquist's dissent and the series of cases that you describe? In other words, if we were five years after Nevada v. Hall being asked to overrule it, that might have been a harder hill to climb. But now that you have all these other cases, that might leave Nevada v. Hall seeming an outlier. How do you respond to that argument? I disagree. I think that all of the subsequent cases were in a very distinguishable context. Primarily, they were about Congress's authority to authorize suits against states. They're about whether or not federal courts can use suits against states. Alden v. Maine was whether or not Congress can require that a state court hear suits against a state. None of them involved the Tenth Amendment question presented in this case. Is there anything in the Constitution that prohibits a state from exercising jurisdiction? But I'd especially direct you to the language in Alden v. Maine at 527 and 738. The Constitution did not reflect an agreement on the states to respect the sovereign immunity of one another. Or at the same decision, Alden v. Maine, pages 739 and 740, says a distinction is drawn between a sovereign's immunity in its own courts and its immunity in the courts of another sovereign. And so we're asking you not simply to adhere to Nevada v. Hall, but also to adhere to what this Court said in Alden v. Maine. And so in that sense, Justice Kavanaugh, nothing has changed since 1979 in the jurisprudence of this Court that would cast doubt upon the holding of Nevada v. Hall. How should we think about the fact that 47 or 45 or whatever it is states have joined in this amicus brief, indicating that they think that their sovereign immunity power is a good deal more important than the power that you've referenced to protect their own citizens in their own courts? The attorney generals of those states filed a brief saying they don't want to have to defend suits. And I am sure the attorney generals of those states would like to see you overrule Nevada v. Hall. But I don't think you can equate a brief filed by state attorney generals with the position of state governments, either state legislatures or state judiciaries. Indeed, if states cared so deeply, not only could they amend the Constitution, as Justice Sotomayor said, but as I said to Chief Justice Roberts, they could enter into compacts with one another to protect themselves from suit. Have there been attempts? It's a pretty remarkable assertion that we shouldn't understand representations of the states' attorneys generals to represent the views of the state. I mean, each of the states have apparatus of their own if they don't think the attorney general, and I don't know who you're speaking of, whether it's the legislature or the governor, to direct the attorney general to, I guess it varies from state to state, but certainly you would expect the attorney general's views to reflect the views of the states. Your Honor, the attorney general is an officer of the state. But I don't necessarily know that filing the brief in this Court, it's reflecting the views of the state legislature, the state judiciaries. The question is, do those state governments want to give up the power to define the jurisdiction of their courts and provide remedies? Should we regard the submissions of the solicitor general here as reflecting the views of the United States or simply the solicitor general? The solicitor general is representing the United States government. That doesn't necessarily mean that Congress will agree with the position of the solicitor general. I'm not saying you should discard the brief of the attorney general, but in answer to Justice Kagan I was simply saying I wouldn't necessarily assume, because the attorney generals of the states don't want to be sued, that the state governments want to give up their sovereign power under the Tenth Amendment, what we're talking about here today. Have there been attempts by the states to enter into agreements of this sort? Not that I'm aware of, Your Honor, but I think that probably reflects this isn't a serious problem. It doesn't arise all that often. For example, if you look at the brief of those 44 states referred to, if you look at page 13, they identify a total of nine cases since 1979 where state governments have been sued in other state courts. And I would think that states would want, if another state comes in and violates the rights of its citizens here, to be able to provide a remedy. The 47 states that don't like this rule make an effort to find things that have happened to their citizens in this state caused by Nevada. And so they all start suing Nevada in their own courts. Perhaps Nevada's attitude would change. It might, Your Honor, but the fact that that hasn't happened in 40 years since Nevada v. Hall leads to the conclusion it's not a problem. We can certainly hypothesize states could begin retaliating against other states, but it just hasn't happened. And if it does, states have the mechanism for protecting themselves, and states are protected already. On the other hand, in a situation like this, a citizen like Mr. Hyatt has no other remedy but the ability to sue in state court when he's injured by another state. He could have gone to the California courts. No, he couldn't have gone to the California courts because California gives sovereign immunity to itself and has a statute that gives broad protection. In fact, Hyatt won. There's no administrative process against the tax assessment that was laid against him? Well, there was an administrative proceeding with regard to the tax assessment, something that's been pending since the 1990s. But in terms of... That actually is a factual question I had. Was that ever adjudicated? Yes, Your Honor. In August of 2017, the California State Board of Equalization overturned the Franchise Tax Board's findings against Mr. Hyatt, both with regard to residency and fraud for 1991 and 92. That is now an appeal in the California Office of Tax Assessment. But it was quite important, Your Honors, that was about his tax liability in California. This is a suit about the torts that were committed against him by California officials within the state of Nevada. For that, he had no remedy in California courts. In fact, Hyatt won. The first time this case was before the court was all about whether or not Nevada, under full faith and credit, had to accord sovereign immunity to California. It's what they had in the California courts. Could the Nevada court have adjudicated the factual premises? Could he have brought some sort of suit in Nevada to adjudicate whether he was a resident of California or not or to find that he had no tax liability? I think a challenge to tax liability would be different, in part because of the Tax Injunction Act and also because of a different principle of comedy under Fair Assessment and Real Estate v. McNary. What's crucial about this case is it's not about tax liability. It's about torts, the invasion of property rights, the defamation, the invasion of privacy rights that occurred. Counsel, what do you do about the petitioner's argument that it's incongruous that Indian tribes have this sort of immunity while states don't? The Chief Justice Marshall, who we've heard about, described the tribes, of course, as quasi-sovereigns, yet the states are recognized as sovereigns. So we have the quasi-sovereigns enjoying immunity, but the actual sovereigns not under your position. Two responses, Your Honor. First, this Court has never decided whether State courts can hear tort claims against Indian tribes. In fact, in Michigan v. Bay Mills Indian Community, in footnote 8, the Court specifically said that was an open question. There's actually a cert petition on that question now pending before you. It's Wilkes v. PCI Gaming. The Alabama Supreme Court held that Indian tribes could be sued in tort in the cert petition before you. So your answer is throw the Indian tribes under the bus. No, Your Honor, I'm saying that it's an unresolved question. But there is a second point that may answer the comment that you just made. Congress has plenary power over Indian tribes. This has been understood since the founding to exclude State interference with Indian affairs. In fact, this Court in the KYI Tribe of Oklahoma versus Manufacturing Technology case said that tribal immunity is a subject of federal law and is not subject to diminution by the States. The relationship of Congress to the Indian tribes is quite different than the relationship of Congress to the States. And so Congress can limit State court jurisdiction with regard to Indian affairs in a way that Congress can't limit State court jurisdiction under the Tenth Amendment. So it's quite distinguishable. The doctrine of stare decisis serves many valuable purposes. So which one would you say most strongly, or which ones would you say most strongly, supports your argument here? Is there any reliance here? And if not, what other stare decisis factors would you cite? Well, I'd go back to this Court's decision in the Hilton versus South Carolina case. In this Court, they said, adherence to precedent promotes stability, predictability, and respect for judicial authority. And this was a case about overturning precedent in the area of constitutional law. This is about stability of law. For 40 years, this has been the law. It's about predictability. People have relied upon this in filing the suits. But it's also about respect for judicial authority. This Court overturning its own precedents inherently undermines that respect for judicial authority. So I would say in terms of all of the values that are identified in Hilton, stare decisis is important here. It was in Hilton that the Court said, there has to be a compelling reason. And there is no compelling reason. There's nothing that's been argued today that couldn't have been presented to this Court and wasn't. That's often. I want to follow that up, because this is a general question I have, and I'd like to call on your knowledge on this.  That every time we overrule a case, it's like a little chink in an armor. And because lawyers have to use our cases to talk to clients. And the client doesn't like what he's hearing. Can we do everything about it? Whatever the field. And the more cases we overrule, the harder it is for the lawyer to say no. And therefore, in many areas, people start to ask us to overrule cases. Because from my point of view, there are many wrong cases. And that's true of every judge and law professor. And once you start down the road, you have to be careful for that reason, in part. Is that true, or am I making it up out of my imagination? Yes, Your Honor. I thought that would be your answer. Yes, I'm making it up out of my imagination, or it's true? No, yes, it is true, Your Honor. I totally agree with what you said about the importance of stare decisis. Well, Mr. Chemerinsky, do you think that the public would have greater respect for an institution that says, you know, we're never going to admit we made a mistake. Because we said it, and we decided it, we're going to stick to it, even if we think it's wrong. Or an institution that says, well, you know, we're generally going to stick to what we've done, but we're not perfect, and when we look back and we think we made a big mistake, we're going to go back and correct it. Which kind of institution would they respect more? Of course this Court should overrule precedent at times. We all agree that Brown v. Board of Education needed to overrule Plessy v. Ferguson. But we also all agree that stare decisis matters. This is just what Justice Breyer was expressing. And that's why I think this Court in Hilton got it exactly right. Precedent should be overruled only where there is a compelling reason for doing so. And what I keep saying... But the question is how we figure out what the compelling reason is. And that's very difficult. And you say nothing has changed. That's true in a lot of cases where the Court has nonetheless overruled a prior decision. And so how are we supposed to think about it? Is it enough, for example, if we think it's egregiously wrong and the prior decision has severe practical consequences and there's no real reliance interest at stake? Is that enough? How to apply that to a particular case is hard. But what I just said in terms of egregiously wrong, severe practical consequences, no real reliance, is that enough, in your view, to overrule? I think egregiously wrong, no practical consequences overruling precedent certainly go a long way to indicating there is a compelling reason for doing so. But I'd also start always by asking, is there anything today that's before the Court that it didn't have when the earlier case was decided? Well, if we applied that strictly, a lot of cases that everyone agrees should be overruled would not have been overruled. And so I'm questioning that particular factor. But I think it's a starting point analysis, and then I'm comfortable with the adverbs you use, like egregiously wrong. And what I've argued to you today is that Nevadaverse Hall not only was not egregiously wrong, but it was correctly decided. But I would emphasize in conclusion that this case is decided by the law of the case doctrine. Here, in the second time the case was before you, you said you were affirming the judgment by a 4-to-4 decision. A 4-to-4 split is a decision on the merits. It's argued in the reply brief that we waived this by not raising the brief in opposition. But if you look at Rule 15.2 from the Supreme Court, and the key language that was left out on page 3 of Petitioner's reply brief, it says any objection to consideration of a question presented based on what occurred in the proceedings below. Those are the words that are omitted in the reply brief. If the objection did not go to jurisdiction, maybe it was called to the Court's attention in the brief in opposition. No one in this litigation, not Petitioner or Respondent, questions anything that went on in the proceedings below. This is entirely a question for this Court, whether to overrule Nevadaverse Hall. I would then conclude as I began, in Nevadaverse Hall, this Court ended its decision by saying that the real intrusion on States would keep them from exercising their sovereign power to define their jurisdiction, but a remedy for their citizens when they're injured by another State. The Court said that would be a diminution of the powers of the people of the United States. Thank you, Your Honor. Thank you, counsel. Four minutes with Mr. Waxman. Thank you, Mr. Chief Justice. In McCulloch v. Maryland, Chief Justice Marshall announced for the Court the constitutional principle, the atextual constitutional principle of intergovernmental immunity because, as he explained, the power of one sovereign to tax another is the power to destroy. Today, Hall v. Nevada stands as the only thing that States can do to each other, the power to render judgments against States that when they entered the Union were effectively bankrupt. They were loaded with Revolutionary War debt. That power to subject sovereign treasuries to judgments of other sovereigns' courts is very much the power to destroy. And had anyone thought at the framing that by forming a more perfect Union that these States, burdened with this debt, were subjecting themselves to suits in other State courts, the Constitution would never have been adopted. The notion that Chisholm's mistake was not suing Georgia in the State courts of his home State, South Carolina, would have been considered an absurdity. Now, as to stare decisis, this really is a case where Hall is a, quote, survivor of obsolete constitutional thinking. The question was, you know, what has changed? What have we done? Recall that the number of cases this Court has decided in the sovereign immunity area, we're talking, you know, not just Seminole Tribe, but Union Gas, Welch, Kiowa, all of those cases, and the reasoning of those cases, the South Carolina Ports Authority case, all long followed this Court's decision. And the basis for this Court's decision in Nevada v. Hall, both of which have been repudiated by this Court's later jurisprudence, are, number one, the Court said, there's nothing explicit in the Constitution, and we're not going to read an immunity that is not explicit in the Constitution. This Court, in at least a dozen cases, has subsequently held, over and over again, that what matters for the protection of sovereign immunity was the framers' understanding at the time of the framing and the postulates that underlie the principles of the consequences of giving up the Wild West Law of Nations for a more perfect union in which states won't retaliate against each other by saying, well, now we're going to, you know, we're going to allow everybody to sue other states in our Court, and we're going to do this, and we're going to do that. The other thing that is different is, in Nevada v. Hall, this Court identified one interest supported by the principle of state sovereign immunity, and that was the state's fisks, which, of course, was overwhelmingly important at the time of the framing. But since then, this Court has said, in at least a half a dozen cases, that the dignity of states and their self-government autonomy are, as Justice Thomas explained for the Court in the Federal Maritime Commission case, the paramount interest to be protected by principles of sovereign immunity. Neither of those two principles that have since been elucidated by the Court were referenced or acknowledged in Nevada v. Hall. Thank you, Mr. Chief. Thank you, Mr. Waxman. Counsel, the case is submitted.